No. 14-1343

IN THE

# United States Court of Appeals for the Fourth Circuit

———————

ROBIN J. YORK, ADMINISTRATRIX OF THE ESTATE OF ADAM R. YORK,

Plaintiff-Appellant,

v.

PROPERTY AND CASUALTY INSURANCE COMPANY OF HARTFORD,

Defendant-Appellee.

———————

On Appeal from the United States District Court
for the Southern District of West Virginia, 2:12-cv-06582
District Judge Joseph R. Goodwin

———————

**BRIEF FOR DEFENDANT-APPELLEE
PROPERTY AND CASUALTY INSURANCE COMPANY OF HARTFORD**

———————

MICHAEL H. CARPENTER
KATHERYN M. LLOYD
CARPENTER LIPPS & LELAND LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
(614) 365-4100

CATHERINE E. STETSON
SEAN MAROTTA
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com

*Counsel for Defendant-Appellee
Property and Casualty Insurance
Company of Hartford*

July 3, 2014

(Additional counsel listed on inside cover)

Additional counsel:

JOHN L. MACCORKLE
RENATHA S. GARNER
MACCORKLE LAVENDER PLLC
300 Summers Street, Suite 800
Charleston, West Virginia 25301
(304) 344-5600

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Fourth Circuit Local Rule 26.1, Defendant-Appellee Property and Casualty Insurance Company of Hartford (Hartford) states that it is a wholly owned subsidiary of Hartford Financial Services Group, Inc.

Hartford further states that no other publicly held corporation or other publicly held entity has a direct financial interest in the outcome of the litigation; that it is not a trade association; and that this case does not arise out of a bankruptcy proceeding.

# TABLE OF CONTENTS

<u>Page</u>

RULE 26.1 CORPORATE DISCLOSURE STATEMENT .....................................i

TABLE OF AUTHORITIES ..................................................................iv

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUES..........................................................2

STATEMENT OF THE CASE.............................................................3

STANDARDS OF REVIEW .............................................................14

SUMMARY OF ARGUMENT .........................................................15

ARGUMENT ..................................................................................20

    I.    THE 30-DAY REMOVAL CLOCK STARTED WHEN
        HARTFORD RECEIVED YORK'S SECOND AMENDED
        COMPLAINT ..........................................................20

    II.    THE DISTRICT COURT DID NOT ABUSE ITS
        DISCRETION IN VACATING HARTFORD'S STATE-
        COURT DEFAULT ...............................................28

    III.    KENTUCKY LAW APPLIES TO YORK'S BAD-FAITH
        CLAIMS ARISING FROM A KENTUCKY INSURANCE
        POLICY ISSUED TO KENTUCKY RESIDENTS ...............35

    IV.    YORK'S EVIDENCE DID NOT CREATE AN ISSUE OF
        MATERIAL FACT AS TO HER BAD-FAITH CLAIMS...................41

        A.    Hartford Was Never Contractually Obligated To Pay
            York Underinsured-Motorist Benefits ...........................42

        B.    York's Evidence Did Not Create A Material Issue Of
            Fact As To Whether Hartford Acted With Reckless
            Disregard To Her Rights ............................................46

CONCLUSION ...............................................................................54

ii

**TABLE OF CONTENTS—Continued**

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

**CASES:**

*Adkins* v. *Sperry*,
  437 S.E.2d 284 (W. Va. 1993)............................................................40

*Augusta Fiberglass Coatings, Inc.* v. *Fodor Contracting Corp.*,
  843 Fd.2d 808 (4th Cir. 1988) ................................................29, 29, 33

*Banca Cremi, S.A.* v. *Alex. Brown & Sons, Inc.*,
  132 F.3d 1017 (4th Cir. 1997) ........................................................14

*Bentley* v. *Bentley*,
  172 S.W.3d 375 (Ky. 2005)..............................................................48

*Blue Cross & Blue Shield of Ky., Inc.* v. *Whitaker*,
  687 S.W.2d 557 (Ky. Ct. App. 1985) ................................................50

*Central Operating Co.* v. *Util. Workers of Am., AFL-CIO*,
  491 F.2d 245 (4th Cir. 1974) ............................................................29

*Cincinnati Ins. Co.* v. *Samples*,
  192 S.W.3d 311 (Ky. 2006)..............................................................48

*Clements* v. *Stephens*,
  211 S.E.2d 110 (W. Va. 1975)..........................................................48

*Colleton Preparatory Academy, Inc.* v. *Hoover Universal, Inc.*,
  616 F.3d 413 (4th Cir. 2010) ............................................................28

*Coots* v. *Allstate Ins. Co.*,
  853 S.W.2d 895 (Ky. 1993)......................................................*passim*

*Cutrone* v. *Mortgage Elec. Reg. Sys., Inc.*,
  749 F.3d 137 (2d Cir. 2014) ............................................................25

*Durham* v. *Lockheed Martin Corp.*,
  445 F.3d 1247 (9th Cir. 2006) ........................................................26

*Farmland Mut. Ins. Co.* v. *Johnson*,
  36 S.W.3d 368 (Ky. 2000)..........................................................20, 49

# TABLE OF AUTHORITIES—Continued

Page

*Gordon* v. *Hartford Fire Ins. Co.*,
105 Fed. Appx. 476 (4th Cir. 2004)....................................................21

*Grubb* v. *Donegal Mut. Ins. Co.*,
935 F.2d 57 (4th Cir. 1991) ...............................................................22

*Guaranty Nat'l Ins. Co.* v. *George*,
953 S.W.2d 946 (Ky. 1997)................................................................46

*Hartford Fire Ins. Co.* v. *Harleysville Mut. Ins. Co.*,
736 F.3d 255 (4th Cir. 2013) .............................................................20

*Howe* v. *Howe*,
625 S.E.2d 716 (W. Va. 2005).............................................................39

*In re Genesys Data Tech.*,
245 F.3d 312 (4th Cir. 2001) .............................................................34

*Int'l Bhd. of Elec. Workers* v. *Hope Elec. Corp.*,
293 F.3d 409 (8th Cir. 2002) .............................................................29

*Kenney* v. *Independent Order of Foresters*,
744 F.3d 901 (4th Cir. 2014) ......................................................*passim*

*Knotts* v. *Zurich Ins. Co.*,
197 S.W.3d 512 (Ky. 2006)................................................................52

*Kuxhausen* v. *BMW Fin. Servs.*,
707 F.3d 1136 (9th Cir. 2013) ....................................................23, 26

*Ky. Farm Bureau Mut. Ins. Co.* v. *Young*,
317 S.W.3d 43 (Ky. 2010)....................................................43, 44, 46

*Lacy* v. *Sitel Corp.*,
227 F.3d 290 (5th Cir. 2000) ......................................................31, 32

*Liberty Mut. Ins. Co.* v. *Triangle Indus., Inc.*,
390 S.E.2d 562 (W. Va. 1990)............................................................40

**TABLE OF AUTHORITIES—Continued**

Page

*Lilly* v. *CSX Transp., Inc.*,
  186 F. Supp. 2d 672 (S.D. W. Va. 2002)............................................21

*Lontz* v. *Tharp*,
  413 F.3d 435 (4th Cir. 2005) .............................................................14

*Lovern* v. *General Motors Corp.*,
  121 F.3d 160 (4th Cir. 1997) ....................................................21, 25, 27

*Malone* v. *Ky. Farm Bureau Mut. Ins. Co.*,
  287 S.W.3d 656 (Ky. 2009)....................................................19, 43, 44

*Marshall* v. *Saseen*,
  450 S.E.2d 791 (W. Va. 1994)...........................................................34

*May* v. *Dover Elevator Co.*,
  40 F.3d 1244, 1994 WL 656034 (4th Cir. 1994) (unpublished).........................22

*McKinney* v. *Fairchild Int'l, Inc.*,
  487 S.E.2d 913 (W. Va. 1997)...........................................................40

*Motorists Mut. Ins. Co.* v. *Glass*,
  996 S.W.2d 437 (Ky. 1997)....................................................46, 47, 50

*Mumfrey* v. *CVS Pharmacy, Inc.*,
  719 F.3d 392 (5th Cir. 2013) .............................................................25

*Noland* v. *Va. Ins. Reciprocal*,
  686 S.E.2d 23 (W. Va. 2009).............................................................35

*Oakes* v. *Oxygen Therapy Servs.*,
  363 S.E.2d 130 (W. Va. 1987).............................................................36

*Payne ex rel. Estate of Calzada* v. *Brake*,
  439 F.3d 198 (4th Cir. 2006) .............................................................14

*Payne* v. *Forest River, Inc.*,
  2014 WL 1120251 (M.D. La. Mar. 20, 2014) .............................................26, 27

# TABLE OF AUTHORITIES—Continued

Page

*Richmond Med. Ctr. for Women* v. *Gilmore*,
224 F.3d 337 (4th Cir. 2000) ............................................................35

*Smith* v. *Bally's Holiday*,
843 F. Supp. 1451 (N.D. Ga. 1994)...................................................24

*Sullivan* v. *Conway*,
157 F.3d 1092 (7th Cir. 1998) .....................................................21, 22

*Sylvia Dev. Corp.* v. *Calvert County, Md.*,
48 F.3d 810 (4th Cir. 1995) ..............................................................15

*Tolson* v. *Hodge*,
411 F.2d 123 (4th Cir. 1969) ............................................................14

*United Servs. Auto. Ass'n* v. *Bult*,
183 S.W.3d 181 (Ky. Ct. App. 2003) .......................................46, 47, 50, 51, 52

*United States* v. *Al-Hamdi*,
356 F.3d 564 (4th Cir. 2004) ............................................................30

*United States* v. *Moradi*,
673 F.2d 725 (4th Cir. 1982) ............................................................33

*Walker* v. *Trailer Transit, Inc.*,
727 F.3d 819 (7th Cir. 2013) .......................................................23, 25

*Wittmer* v. *Jones*,
864 S.W.2d 885 (Ky. 1993)..........................................................42, 46

*Yarnevic* v. *Brink's Inc.*,
102 F.3d 743 (4th Cir. 1996) ............................................................24

*Young* v. *Wheby*,
30 S.E.2d 6 (W. Va. 1944)................................................................48

*Zornes* v. *Specialty Indus., Inc.*,
166 F.3d 1212, 1998 WL 886997 (4th Cir. 1988) (unpublished)......................29

# TABLE OF AUTHORITIES—Continued

Page

STATUTES:

28 U.S.C. § 1291 .................................................................................2

28 U.S.C. § 1332(a) .............................................................................1

28 U.S.C. § 1332(c)(2) .........................................................................1

28 U.S.C. § 1441(a) .............................................................................1

28 U.S.C. § 1446(b) ......................................................................*passim*

Ky. Rev. Stat. Ann. § 304.39-320(3) .........................................42, 43

Ky. Rev. Stat. Ann. § 304.39-320(4) .................................................43

RULES:

Fed. R. Civ. P. 60(b)(1) .....................................................................28

Fed. R. Civ. P. 60(b)(4) .....................................................................34

Fed. R. Civ. P. 55(c) ..........................................................................52

W. Va. R. Civ. P. 54(c) ...............................................................33, 34

W. Va. R. Civ. P. 55(b)(2) ...................................................................8

OTHER AUTHORITIES:

*Restatement (Second) of Conflict of Laws* § 6 ..........................38, 39, 40

*Restatement (Second) of Conflict of Laws* § 145 ............................36, 38

Charles A. Wright, *et al.*, 14C *Federal Practice & Procedure* § 3731
    (4th ed. 2014).........................................................................23, 24

IN THE

# United States Court of Appeals
# for the Fourth Circuit

———————

No. 14-1343

———————

ROBIN J. YORK, ADMINISTRATRIX OF THE ESTATE OF ADAM R. YORK,

Plaintiff-Appellant,

v.

PROPERTY AND CASUALTY INSURANCE COMPANY OF HARTFORD,

Defendant-Appellee.

———————

On Appeal from the United States District Court
for the Southern District of West Virginia, 2:12-cv-06582
District Judge Joseph R. Goodwin

———————

**BRIEF FOR DEFENDANT-APPELLEE
PROPERTY AND CASUALTY INSURANCE COMPANY OF HARTFORD**

———————

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. § 1441(a) and 28 U.S.C.

§ 1332(a). Plaintiff Robin York, the administrator of Adam York's estate, is a

Kentucky citizen. 28 U.S.C. § 1332(c)(2); J.A. 20. Hartford is an Indiana

corporation with its principal place of business in Connecticut. J.A. 20. The

amount in controversy at the time of removal was over $4 million. J.A. 22.

Hartford's removal was timely because it came fewer than 30 days after Hartford first received notice that the case was removable.  *Infra* at 20-27.

The District Court entered judgment on March 4, 2014.  J.A. 1262.  York appealed on March 31, 2014.  J.A. 1263.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether Hartford timely removed this action when it filed its notice of removal fewer than 30 days after it received York's second amended complaint, the first document giving Hartford notice that the non-diverse defendants in the case were nominal only.

2.    Whether the District Court acted within its broad discretion in vacating a $4-million-plus default judgment against Hartford where Hartford's default was due to a clerical error and the judgment was over forty times more than the amount demanded in York's operative complaint.

3.    Whether, under West Virginia choice-of-law principles, Kentucky law applies to a Kentucky resident's allegations of an insurance company's bad-faith handling of an underinsured-motorist claim made under a Kentucky insurance policy.

4.    Whether the District Court correctly held that York's evidence did not create a triable issue of material fact under Kentucky bad-faith law because her

evidence—at most—demonstrated that Hartford had not paid her claim as quickly as she would have liked.

## STATEMENT OF THE CASE

**The Yorks' Kentucky Hartford Automobile Insurance Policy.**  Plaintiff Robin York and her husband have been Kentucky residents for over 30 years.  J.A. 800.  In 2004, they applied for and received a Hartford automobile insurance policy for their vehicles.  J.A. 95, 111.  Their Hartford policy was a Kentucky policy.  The Yorks completed a supplemental application for "Your Coverage Selections In Kentucky," J.A. 98; their policy was entitled "Personal Auto Insurance Policy—Kentucky," J.A. 111; and they received the declaration pages following their annual renewal of the policy as well as all other communications from Hartford at their Kentucky address.  *E.g.* J.A. 107, 205, 208, 210, 212.

The Yorks' insurance policy includes an underinsured-motorist benefit with a $100,000 limit.  J.A. 108.  The policy extends that benefit to both the Yorks and their "family member[s]," which the policy defines as those related to the Yorks "by blood, marriage or adoption who [are] a resident of [their] household."  J.A. 113, 123.  In 2011, one of the Yorks' family members was their adult son Adam, who lived with his parents at their Kentucky address.  J.A. 275-276.

**The Underlying Accident and Underinsured-Motorist Claim.**  On October 13, 2011, Adam York was a back-seat passenger in a Toyota sport utility

vehicle driven by Joshua Miller in Mingo County, West Virginia. J.A. 64-65. Miller—drunk—struck an embankment, overturning the car. J.A. 65. Adam died as a result of the crash. *Id.*

York petitioned the Pike County, Kentucky Circuit Court to appoint her the administrator of Adam's estate, and the court granted the petition. J.A. 350. York thereafter sued Miller in the Mingo County Circuit Court for wrongfully causing Adam's death. J.A. 27-38. York also submitted a claim for underinsured-motorist benefits under her Kentucky Hartford policy. J.A. 282. Hartford acknowledged receipt of the claim and opened a file. J.A. 285.

The Hartford policy's underinsured-motorist benefit is excess to moneys received from the tortfeasor. J.A. 123. The policy's underinsured-motorist section explains that Hartford will not "make a duplicate payment under this coverage for any element of loss for which a payment has been made by or on behalf of persons or organizations who may be legally liable." *Id.* In addition, the policy's benefit is subject to any defenses that the tortfeasor might have against the insured. *Id.* And Hartford has the right to advance its policy limits to its insured and pursue a subrogated recovery against any liable tortfeasors. *See Coots* v. *Allstate Ins. Co.*, 853 S.W.2d 895, 902 (Ky. 1993). Hartford's adjuster accordingly investigated York's claim to determine, among other things, whether there was other insurance available to pay for York's damages; whether Miller had assets out of which a

4

judgment in excess of his automobile-insurance policy's limits could be satisfied; and whether Miller had any defenses against York's wrongful-death claim that Hartford could assert. J.A. 218-220. Hartford's adjuster corresponded with York's attorney throughout her investigation. J.A. 218-222, 228-232, 237-241.

**Miller's Proposed Settlement with York**. In December 2011, Miller's insurer notified York's attorney that it would pay its $100,000 policy limits, subject to a waiver of Hartford's subrogation rights. J.A. 900. A month later, York's attorney forwarded Miller's offer to Hartford's adjuster, requesting a waiver so that York could accept Miller's offer "should [she] choose to do so." J.A. 902-903. The attorney's transmittal letter also demanded the limits of the Hartford policy's underinsured-motorist benefit. J.A. 902. York later admitted that, as of her attorney's January letter to Hartford, she had not decided whether to settle with Miller. J.A. 673-674.

Hartford's adjuster did not immediately respond to York's letter, and York's attorney did not follow up on it. J.A. 916- 919. As it turned out, each side was waiting on the other. York's attorney thought Hartford had to waive subrogation before York could formally accept Miller's settlement offer. J.A. 824. Hartford's adjuster, by contrast, was awaiting notice that York had actually accepted Miller's settlement offer before she made an offer of underinsured-motorist benefits. J.A. 920-923.

**York's First Amended Complaint and Hartford's Default.** Rather than follow up with Hartford's adjuster, York filed an amended complaint naming Hartford as a defendant. J.A. 33-38. York's count against Hartford alleged that York was covered by the Hartford policy, that Miller was an underinsured motorist, and that Hartford had not paid York's $100,000 claim. J.A. 37. York's amended complaint also added claims against Miller's parents for negligently entrusting their vehicle to their son. J.A. 35.

York served her amended complaint on the West Virginia Secretary of State, who forwarded it through Hartford's registered agent to Hartford's Connecticut headquarters. J.A. 262-263, 321. There, the complaint was reviewed by a Hartford analyst assigned to screen incoming legal papers. J.A. 318-321. The analyst determined that the complaint was related to York's pending underinsured-motorist claim, stamped it "Lawsuit," and wrote Hartford's existing claim number on the first page. J.A. 321. The analyst then forwarded the complaint to a Hartford contractor in Kentucky responsible for scanning documents and uploading them to Hartford's electronic claims-management system. J.A. 320-321.

When York's amended complaint arrived in Kentucky, however, Hartford's contractor did not use the claims number written on the face of the complaint to associate it with York's file. J.A. 322. Instead, the contractor attempted to match the complaint to an existing claims file using the party names listed in the

6

complaint's caption. *Id.* Hartford's contractor matched the amended complaint to a closed workers' compensation claim by a "Joshua Miller" unrelated to the defendant in York's case and filed York's amended complaint in the closed workers' compensation file. J.A. 322-323.

Because York's amended complaint was accidentally misfiled, the adjuster handling York's claim was never notified. J.A. 323. Hartford thus did not answer the amended complaint, and York moved for default. J.A. 62-63. York's attorney did not serve the default motion on Hartford. J.A. 852.

During this time, York's attorney was in contact with Hartford's adjuster regarding York's claim; but he never mentioned the amended complaint to her or asked about Hartford's failure to answer. J.A. 222, 825-826. Even after Hartford's adjuster wrote to York's attorney in May 2012 expressing concern that "it's been sometime since we've heard from you regarding this loss," J.A. 221, 237-238, he still did not bring up the amended complaint. J.A. 633, 850. He instead—for the first time—requested a response to his January letter. *Id.*

On June 11, 2012, Hartford's adjuster called York's attorney to offer him the Hartford policy's limits once the underlying claim against Miller was resolved. J.A. 221-222, 827-829. The adjuster left a voicemail telling York's attorney that "we * * * have 100,000 in this" and "we're tendering our offer on that." J.A. 828. York's attorney did not respond to the adjuster's message. *Id.* In his view, the

adjuster's voicemail was simply a prelude to a formal written offer.  J.A. 828-829. Hartford's adjuster, meanwhile, continued to wait for judicial approval of a York-Miller settlement, after which Hartford could write York a check for the policy limits.  J.A. 221-222, 1230-1233.

The West Virginia court entered default against Hartford on June 12, 2012. J.A. 62-63.

**The West Virginia Default Judgment and York's Second Amended Complaint.**  In August 2012, York petitioned the West Virginia court to approve a $100,000 settlement with the Millers and enter a default judgment against Hartford. J.A. 512-525.  Sent without a cover letter, J.A. 853, York's papers primarily consisted of a notice of the hearing to approve the settlement, a verified petition to approve the settlement, and a certificate of service for the two documents.  J.A. 512-522, 524-525.

Inserted between the verified petition and certificate of service was a one-page notice stating that the West Virginia trial court would "conduct a writ of inquiry in accordance with W.Va.R.Civ.P. 55(b)(2)" on the same date and at the same time as the hearing to approve York's settlement with the Millers.  J.A. 523. The notice's body did not mention Hartford by name, and—except for the cross-reference to West Virginia Rule of Civil Procedure 55(b)(2)—did not state that the hearing's purpose was to compute York's damages on her claim against Hartford.

8

*Id.* Nor did the notice have its own certificate of service that would have called attention to it. *Id.*

York's attorney prepared the papers personally and put them in an envelope for mailing to Hartford's adjuster. J.A. 855. He later conceded that he attached the wrong certificate of service to the default-hearing notice and that he had intended to send the petition and default-hearing notice as two separate documents. J.A. 860-861.

Because the default-hearing notice was buried in the middle of the settlement papers, Hartford's adjuster did not notice the document or comprehend its significance. J.A. 223. Instead—as she had throughout—the adjuster assumed that once the West Virginia court granted York's petition to approve the settlement, Hartford could pay its policy limits and close its file. J.A. 222.

At the August 6 hearing, the West Virginia court entered a $4,027,615.18 default judgment against Hartford. J.A. 64-69. The court based its award on York's wrongful-death damages in the underlying tort suit, less a $100,000 set-off for the Millers' insurance proceeds. J.A. 64-69. The court did not explain why damages for what York pleaded as a contractual underinsured-motorist claim should be measured by tort personal-injury standards. Nor did the court explain why it had entered judgment over forty times greater than the $100,000 demanded by York's amended complaint. In fact, York's attorney never argued for an extra-

contractual theory of recovery at the default hearing and never mentioned the Hartford policy's limits.  J.A. 843-844.

The West Virginia court also approved the settlement between York and the Millers.  J.A. 43-47.  The court's order directed that the Millers "be dismissed with prejudice, except to the extent that they may be named as defendants for underinsured motorist coverage."  J.A. 46-47.  Neither August 6 order—neither the over $4 million default judgment, nor the order dismissing the Millers—was ever served on Hartford.  J.A. 502.

The West Virginia court soon thereafter entered a consent order permitting York to file a second amended complaint against Hartford in order to add "extra contractual claims, common law bad faith, and violations of the [West Virginia] Unfair Trade Practices Act."  J.A. 506-508.  But even as York prepared her second amended complaint, Hartford continued trying to pay her.  In mid-August, Hartford's adjuster wrote to York's attorney, reminding him that Hartford was "currently awaiting approval with the estate and the tortfeasor" and "[o]ur limits have been tendered in this matter."  J.A. 221-222, 243.  As with Hartford's June voicemail, York's attorney did not respond to Hartford's August letter.  J.A. 637-638.

Instead, York's attorney filed a second amended complaint on August 20, 2012.  J.A. 53-73.  Although the complaint named the Millers as defendants, its

substantive counts—allegations that Hartford handled York's underinsured-motorist claim in bad faith—sought relief only from Hartford. J.A. 54-61. York's attorney served the second amended complaint on Hartford via the West Virginia Secretary of State on September 12, 2012, J.A. 72, and Hartford received it on September 24, 2012. J.A. 321.

**District Court Proceedings.** Realizing for the first time that a default judgment had been entered against it—and realizing that the West Virginia defendants named in the second amended complaint were nominal only—Hartford removed the case to federal court on October 12, 2012. J.A. 18-24. Hartford then moved to vacate the state-court default, arguing that Hartford's default was the result of excusable neglect. J.A. 537. York opposed the motion to vacate and moved to remand the case to state court on the ground that Hartford's removal was untimely. J.A. 530.

The District Court denied York's remand motion and set aside Hartford's default. J.A. 528-547. The court held that Hartford's removal was timely because it came within 30 days of Hartford's receipt of York's second amended complaint. J.A. 533-536. That, the court held, was the first time Hartford had actual notice of the case's removability, and 28 U.S.C. § 1446(b) starts the 30-day removal clock when " 'the defendant ascertains removability, not when it is created.' " J.A. 536 (citation omitted).

11

The court also concluded that the default judgment should be vacated because Hartford's default was the result of excusable neglect and Hartford had a meritorious defense. J.A. 537-541. The court acknowledged that "Hartford was responsible for failing to respond to the First Amended Complaint." J.A. 540. But it also found that York's attorney " 'stuck within th[e] 16-page settlement hearing notice packet an unrelated one-page notice' " regarding the default-judgment hearing, J.A. 537 (citation omitted), and that "Hartford's culpability [was] mitigated by the fact that [York's] counsel neglected to mention the lawsuit to Hartford's claim adjuster." J.A. 540. Hartford, moreover, had a meritorious defense because the West Virginia court's $4 million judgment was in clear violation of West Virginia's procedural rules forbidding default judgments from exceeding the amount sought in the operative complaint. J.A. 539.

Because the District Court's order vacated York's judgment against Hartford on her underinsured-motorist claim, the court permitted her to re-plead it in a third amended complaint. J.A. 547; J.A. 567-579 (York's third amended complaint). And although Hartford's February 2013 answers to interrogatories reminded York that Hartford's offer of its policy limits was still outstanding, J.A. 740-741, York did not actually accept Hartford's offer until November 5, 2013. J.A. 640. Hartford delivered a $100,000 check ten days later. *Id.*

After the completion of discovery, Hartford moved for summary judgment on York's remaining bad-faith claims. J.A. 643. Hartford first pointed out that Kentucky law applied to York's claims as a matter of West Virginia choice-of-law principles. ECF No. 84 at 7-11. And under Kentucky law, Hartford argued, York's evidence fell short of creating a triable issue of material fact in two respects. First, any delay in Hartford tendering its policy limits was irrelevant because York had not properly perfected a claim for underinsured-motorist benefits. *Id.* at 11-17. In other words, because York was not entitled to any underinsured-motorist benefits at all, Hartford's voluntary payment of those benefits could not have been in bad faith. *Id.* at 15-16. Second, even if York properly perfected her underinsured-motorist claim—and even if Hartford had delayed paying its policy's limits—that delay did not amount to bad faith. *Id.* at 17-20.

The District Court agreed and granted Hartford summary judgment. J.A. 1249-1261. Applying this Court's existing precedents, the District Court held that Kentucky law applied to York's bad-faith claims. J.A. 1253-1258. The District Court also held that even if York's evidence established that Hartford delayed payment of her underinsured-motorist claim, that evidence did not create a material issue of triable fact under Kentucky law. J.A. 1259-1261. Kentucky, the District Court explained, requires that the plaintiff adduce " 'proof or evidence supporting a reasonable inference that the purpose of [an insurer's] delay [in payment] was to

13

extort a more favorable settlement or to deceive the insured with respect to the applicable coverage.' " J.A. 1260 (citation omitted). None of York's evidence—even viewed in the light most favorable to her—met that exacting standard. J.A. 1260-1261. And because Hartford's conduct did not amount to bad faith even if York properly perfected her underlying contractual claim for benefits, the District Court did not address Hartford's separate argument on that point.

This appeal followed. J.A. 1263-1264.

## STANDARDS OF REVIEW

1.     This Court reviews the denial of a motion to remand to state court de novo. *Lontz* v. *Tharp*, 413 F.3d 435, 439 (4th Cir. 2005).

2.     This Court reviews a district court's decision to vacate a default judgment for an abuse of discretion. *Payne ex rel. Estate of Calzada* v. *Brake*, 439 F.3d 198, 203 (4th Cir. 2006). That review is doubly deferential where—as here—the district court sets aside the default, because "[a]ny doubts whether relief should be granted should be resolved in setting aside the default so that the case may be heard on the merits." *Tolson* v. *Hodge*, 411 F.2d 123, 130 (4th Cir. 1969).

3.     This Court reviews a district court's interpretation of state law, including a state's choice-of-law principles, de novo. *Banca Cremi, S.A.* v. *Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1037 (4th Cir. 1997).

4.     Finally, this Court reviews a district court's grant of summary judgment de novo, applying the same standard as the district court. *Sylvia Dev. Corp.* v. *Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). "Summary judgment is justified if, from the totality of the evidence presented, including pleadings, depositions, answers to interrogatories, and affidavits, the court is satisfied that there is no genuine issue for trial and the moving party is entitled to judgment as a matter of law." *Id.*

## SUMMARY OF ARGUMENT

I.  Hartford's notice of removal was timely.  York's second amended complaint was the first paper received by Hartford from which it could ascertain that York was no longer seeking relief from any West Virginia defendant. Hartford's 30-day removal clock under 28 U.S.C. § 1446(b) therefore started when Hartford received the complaint on September 24, 2012, and its October 12 removal of York's complaint to federal court was timely.

York's arguments to the contrary are meritless.  To the extent that York claims that Hartford's receipt of her July petition to approve her settlement with the Millers triggered Hartford's 30-day clock, she is wrong.  York's case was not removable until the Millers were *actually* dismissed as defendants, not when York *proposed* to dismiss them as defendants.  And Hartford's removal clock of course could not start until the case was removable.

15

York fares no better in arguing that Hartford's time to remove commenced following the West Virginia trial court's August 6 hearing. The trial court's order dismissing the Millers could not have started Hartford's 30-day period to remove because Hartford was never served with the order. The trial court's oral statements at the hearing could not have sufficed either, because Hartford was not present to hear them. And York's argument that Hartford should be charged with constructive knowledge of the August 6 hearing is contrary to this Court's and many others' holdings that whether the 30-day clock has commenced turns on the face of the papers actually received by a defendant, not what the defendant could have learned through independent investigation.

II. The District Court did not abuse its discretion in setting aside the West Virginia trial court's default judgment against Hartford. The District Court reasonably concluded that Hartford's misfiling of York's amended complaint was due to excusable neglect, and that Hartford's objection to the state trial court entering a $4-million-plus default judgment on what was pleaded as a $100,000 underinsured-motorist-insurance contract claim was potentially meritorious.

York does not challenge the District Court's excusable-neglect finding as to Hartford's misfiling of her amended complaint. Instead, York claims—for the first time—that Hartford's failure to spot her one-page notice regarding the West Virginia court's default-judgment hearing was inexcusable neglect. York's failure

16

to preserve her argument below is fatal to her claim here; the District Court could not have abused its discretion in not considering an argument York never made. But in any event, the District Court reasonably found that Hartford's nonappearance was reasonable given that York's attorney buried the notice in unrelated papers and that he failed to mention the hearing to Hartford's adjuster despite being in regular contact with her.

York's claim that West Virginia law permitted the eye-popping extra-contractual damages the state court awarded similarly misses the mark. The District Court did not rule based on the substance of West Virginia insurance law, but on West Virginia's procedural requirement that default judgments not exceed the amount sought in the complaint. And West Virginia law in any event only permits an insured to recover the policy limits, attorneys' fees, and damages caused by an insurer's delay. Nothing allows the wrongful-death damages that the West Virginia trial court awarded.

III.  On the merits, the District Court correctly concluded that Kentucky law applies to York's bad-faith claims. West Virginia uses both the *lex loci delicti*— location of the harm—and *Restatement (Second) of Conflict of Laws* approaches to determine the applicable state law in tort cases. Under this Court's recent holding in *Kenney* v. *Independent Order of Foresters*, 744 F.3d 901 (4th Cir. 2014), West Virginia bad-faith claims are classified as torts for choice-of-law purposes and the

17

location of the harm is the state in which the insured is a resident.  Here, then, York suffered her alleged harm from Hartford's claims practices in Kentucky—the state in which she and Adam York's estate are residents.  And that means Kentucky law applies under a *lex loci delicti* analysis.

A *Restatement* weighing of contacts and analysis of public policy also points to Kentucky law.  York suffered her injury in Kentucky, she and Adam York's estate are Kentucky residents, and her relationship with Hartford is centered in Kentucky, where York sought policy benefits.  Moreover, West Virginia has minimal interest in having its law apply to this dispute because it does not involve West Virginia residents on either side.  Finally, applying Kentucky law to a claim arising from a Kentucky insurance policy is consistent with the parties' reasonable expectations; insureds and insurers do not ordinarily expect their relationship to be governed by the state where a loss fortuitously occurs.  Under both potential choice-of-law frameworks, the District Court appropriately chose Kentucky law.

IV.  Finally, the District Court correctly concluded that York's evidence did not create a triable issue of material fact on her bad-faith claim.  To prevail on a bad-faith claim under Kentucky law, an insured must prove both that she has a contractual claim to benefits and that the insurer acted with reckless disregard to her rights under the policy.  York's evidence established neither.

18

York's bad-faith claim fails at the threshold because she never properly perfected a contractual claim for underinsured-motorist benefits. Under Kentucky law, an insured that wishes to settle with a tortfeasor but retain her right to seek underinsured-motorist benefits must send her insurer a so-called *Coots* notice stating that the insured and tortfeasor have agreed to settle the insured's tort claims. An insured who sends a notice that states only that she is *considering* a settlement offer from the tortfeasor does not satisfy that requirement and therefore waives her claim to underinsured-motorist benefits if she settles without her insurer's consent. *Malone* v. *Ky. Farm Bureau Mut. Ins. Co.*, 287 S.W.3d 656, 656 (Ky. 2009).

Here, York's January letter only informed Hartford that she *might* settle with the Millers. The letter was therefore insufficient to preserve her right to seek underinsured-motorist benefits from Hartford. And York's claim that Hartford waived her waiver by not following up on her defective notice is meritless. An insurer at most has a duty to inquire only when an insured's *Coots* notice is ambiguous, not when it is inadequate. York had no contractual claim for benefits, and her bad-faith claims fail as a matter of law.

The District Court also appropriately concluded that York's evidence did not satisfy Kentucky's demanding evidentiary standard for bad-faith claims. York's primary argument is that Hartford unreasonably delayed payment on her claim. But under Kentucky law, an unreasonable delay in payment becomes bad faith

19

only when an insurer " 'lowball[s] claims or delay[s] claims hoping that the insured will settle for less.' " *Farmland Mut. Ins. Co.* v. *Johnson*, 36 S.W.3d 368, 376 (Ky. 2000) (citation omitted). Here, once Hartford investigated York's claim, it never offered York a penny less than her $100,000 policy limits. Although there may have been a breakdown in communications that prevented Hartford from paying those policy limits as quickly as York would have liked, that breakdown does not amount to bad faith.

## ARGUMENT

## I.   THE 30-DAY REMOVAL CLOCK STARTED WHEN HARTFORD RECEIVED YORK'S SECOND AMENDED COMPLAINT.

If a case is not removable when first brought, "a notice of removal may be filed within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b). Here, York's second amended complaint was the first paper Hartford received indicating that York was not seeking any relief from any West Virginia defendant, and thus that complete diversity existed. J.A. 53-73; *see also Hartford Fire Ins. Co.* v. *Harleysville Mut. Ins. Co.*, 736 F.3d 255, 260 (4th Cir. 2013) (a party is nominal, and its presence does not destroy complete diversity, when the party has "no immediately apparent stake in the litigation either prior or subsequent to the act of removal"). Hartford received that complaint on September

20

24,[1] and removed the case on October 12, fewer than 30 days later. J.A. 321.

Hartford's removal was therefore timely.

York's argument to the contrary is not always clear. Initially, York appears

to argue that the clock-starting event was Hartford's receipt of the July 20 petition

to approve her settlement with the Millers. York Br. 15 (arguing that "Hartford

had actual notice that a hearing was to be held on August 6, 2012 for the purpose

of * * * dismiss[ing] all pending claims against the Miller defendants"). But

removability is created by the "dismissal of a nondiverse defendant," *Lovern* v.

*General Motors Corp.*, 121 F.3d 160, 162 (4th Cir. 1997), not the *proposed*

dismissal of a non-diverse defendant. Had Hartford removed upon receipt of

York's petition, its notice would have been premature: the non-diverse West

Virginia defendants were still in the case. *Sullivan* v. *Conway*, 157 F.3d 1092,

1094 (7th Cir. 1998). As the *Sullivan* court explained, it would be "fantastic to

suppose that that the time for removing a case could run *before* the case became

---

[1] The "overwhelming majority of district courts to consider the question have held that '[w]hen service is effected on a statutory agent,' " such as the Secretary of State, " 'rather than on an agent appointed by the defendant, the time to remove the action to federal court does not start to run until the defendant actually has received a copy of the complaint.' " *Gordon* v. *Hartford Fire Ins. Co.*, 105 Fed. Appx. 476, 480 (4th Cir. 2004) (quoting *Lilly* v. *CSX Transp., Inc.*, 186 F. Supp. 2d 672, 672 (S.D. W. Va. 2002)). But regardless of whether the 30-day clock started upon York's September 12 service of the second amended complaint on the West Virginia Secretary of State or its receipt by Hartford on September 24, Hartford's October 12 removal was timely.

21

removable." *Id.* Section 1446(b) "speaks of a motion or other paper that discloses that the case is or *has become* removable, not that it may sometime in the future become removable if something happens, in this case the granting of a [petition] by the state judge." *Id.* (emphasis added).

This Court's cases are in accord. The Court has held that a defendant's receipt of a proposed order dismissing the only non-diverse party did not start the defendant's 30-day removal clock because the plaintiff could "presumably have changed her mind and decided not to voluntarily dismiss" the non-diverse defendant, thus preventing the case from becoming removable. *May* v. *Dover Elevator Co.*, 40 F.3d 1244, 1994 WL 656034, at *3 (4th Cir. 1994) (unpublished). Similarly, the Court has held that a state judge's announcement in open court that the only non-diverse defendants were dismissed did not make the plaintiff's case removable until the judge entered a conforming order. *Grubb* v. *Donegal Mut. Ins. Co.*, 935 F.2d 57, 59 (4th Cir. 1991). The Court explained that because the judge could have "change[d] his mind before making [his] ruling a formal one," the "case was not officially removable until the dismissal order was entered on the docket." *Id.* The same is true here. Because York could have withdrawn her petition or the state-court judge could have denied it, Hartford's receipt of York's petition did not start its 30-day removal clock. *See* J.A. 707-708 (York's attorney

admitting that York's petition to dismiss the Millers could have been denied by the West Virginia trial court).

That leaves York's argument that Hartford was required to remove within 30 days of the West Virginia court's August 6 order dismissing the Millers. York Br. 15-16. But "[t]he moment a case becomes removable and the moment the 30-day removal clock begins to run 'are not two sides of the same coin.' " *Walker* v. *Trailer Transit, Inc.*, 727 F.3d 819, 824 (7th Cir. 2013) (quoting *Kuxhausen* v. *BMW Fin. Servs.*, 707 F.3d 1136, 1141 n.3 (9th Cir. 2013)). As the text of Section 1446(b) "makes clear, the 30-day clock is triggered by pleadings, papers, and other litigation materials *actually received* by the defendant." *Id.* at 825 (emphasis added); *accord* Charles Alan Wright, *et al.*, 14C *Federal Practice & Procedure* § 3731 (4th ed. 2014) (observing that "[t]he clear purpose" of Section 1446(b) "is to commence the running of a new 30-day period once the defendant has received *actual notice*, through one of the documents described * * *, that a previously unremovable case has become removable") (footnote omitted; emphasis added). Here, Hartford never actually received the August 6 order dismissing the Millers until its paralegal copied the order from the state court's case file on September 28. J.A. 502, 504. The order therefore could not have triggered Hartford's 30-day deadline to remove, even if it made the case removable.

To get around Hartford's non-receipt of the August 6 order, York argues that statements made in open court qualify as "other papers" under Section 1446(b) and that the West Virginia court proceeding approving York's petition was accordingly an "other paper" that started Hartford's removal clock. York Br. 15-16. York, however, does not point to any oral statement in the record that could have started Hartford's time to remove. Moreover, even if oral statements can qualify as "papers"—a question on which the courts to have considered it are divided[2]—the statements at the August 6 hearing were not "information received by [Hartford]," such as would trigger its 30-day deadline. *Yarnevic* v. *Brink's Inc.*, 102 F.3d 743, 755 (4th Cir. 1996). Hartford was not present at the hearing and did not receive anything—paper or otherwise—at it.

York nonetheless argues that Hartford should be charged with constructive knowledge of the August 6 settlement hearing because "Hartford chose * * * not to appear." York Br. 15-16 (emphasis omitted). But Hartford had no obligation to appear at the West Virginia court's hearing approving the settlement between York and the Millers, and the separate default-judgment hearing against Hartford had no impact on the case's removability. We suppose that York means that if Hartford had appeared for the default-judgment hearing, its representative might have sat in

---

[2] *See Smith* v. *Bally's Holiday*, 843 F. Supp. 1451, 1454-55 (N.D. Ga. 1994) (noting split and collecting cases); *Federal Practice & Procedure*, *supra*, at § 3731 (same).

on the settlement hearing taking place on the same day. But we are aware of no case holding that proceedings an attorney happens to overhear while waiting for his client's case to be called are "other papers" triggering the deadline for removal under Section 1446(b). York certainly does not cite one.

In any event, this Court and its sister circuits have roundly rejected claims that the time to remove can be triggered by what a defendant could have or should have known. This Court has said it "will not require courts to inquire into the subjective knowledge of the defendant, an inquiry that could degenerate into a mini-trial regarding who knew what and when." *Lovern*, 121 F.3d at 162. Instead, the court should determine whether the time to remove has commenced based on "the four corners of the initial pleading or subsequent paper." *Id.* The Seventh Circuit has likewise emphasized that "[a]ssessing the timeliness of removal should not involve a fact-intensive inquiry about what the defendant * * * should have discovered through independent investigation." *Walker*, 727 F.3d at 825. And the Second Circuit has held that it "do[es] not require a defendant to perform an independent investigation * * * to determine removability and comply with the 30-day period[ ]." *Cutrone* v. *Mortgage Elec. Reg. Sys., Inc.*, 749 F.3d 137, 145 (2d Cir. 2014).

Other circuits concur. *See Mumfrey* v. *CVS Pharmacy, Inc.*, 719 F.3d 392, 399 (5th Cir. 2013) (explaining that the Fifth Circuit's cases "reject[ ] a so-called

due-diligence standard"); *Kuxhausen*, 707 F.3d at 1141 (rejecting the argument that the defendant "should have recognized" that the case was removable based on information outside of the papers served by the plaintiff). As the Ninth Circuit has succinctly explained, federal courts "don't charge defendants with notice of removability until they've received a paper that gives them enough information to remove." *Durham* v. *Lockheed Martin Corp.*, 445 F.3d 1247, 1251 (9th Cir. 2006). Because York's second amended complaint was the first paper Hartford received that gave it enough information to ascertain removability, it was that document—not the August 6 proceedings—that triggered Hartford's 30 days to remove.

The only case York claims is to the contrary is *Payne* v. *Forest River, Inc.*, 2014 WL 1120251 (M.D. La. Mar. 20, 2014). There, York says, "the court found that a defaulted party's failure to appear at a hearing at which information is produced establishing diversity jurisdiction triggers the thirty day removal period even if the defaulting party does not actually learn of the information until later." York Br. 16. Every assertion in that sentence is false. In *Payne*, the plaintiff had argued that defendant's removal was untimely because it was 30 days after service of the plaintiff's initial pleading. 2014 WL 1120251, at *2. The district court disagreed, explaining that the removal clock did not start at service because the plaintiff's complaint did not notify defendant that the amount in controversy was

more than the jurisdictional threshold. *Id.* Instead, the removal clock only "arguably" began to run when the plaintiff introduced an exhibit at a state-court default hearing detailing his damages. *Id.* at *3-*4. But because the defendant removed within 30 days of the default hearing, the court never had to determine whether the hearing *actually* triggered the defendant's 30-day deadline. *Id.* *Payne*'s statement about the default hearing was an *arguendo* assumption, not a holding. *See also id.* (noting that "the 30-day period began to run from Defendant's *receipt* of 'an amended pleading, motion, order or other paper' first indicating that the case was or had become removable") (emphasis added; citation omitted).

York's final argument is that holding Hartford's removal timely "sanctions Hartford's misconduct of turning a blind eye both to the authority of the courts of West Virginia and to the diversity creating event." York Br. 16. The District Court's ruling "sanctions" no "misconduct" of any sort; Hartford removed precisely when the removal statute said it could. And this Court has rejected a similar argument before. It has explained that in diversity cases, the removal statute "explicitly safeguards against * * * strategic delay by erecting an absolute bar to removal * * * 'more than 1 year after commencement of the action.'" *Lovern*, 121 F.3d at 163 (quoting 28 U.S.C. § 1446(b)). That bar creates "a sufficient incentive for defendants to promptly investigate the factual requisites for

diversity jurisdiction" without the unworkable fact-intensive inquiry that York's constructive-knowledge test would require. *Id.* York's approach has never been accepted by any court, and is contrary to the holdings of this Court and many others. It should be rejected.

## II.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN VACATING HARTFORD'S STATE-COURT DEFAULT.

York next argues that the District Court abused its discretion in vacating the state-court default judgment under Federal Rule of Civil Procedure 60(b)(1). York Br. 17-20. But York cites no case, from any court, holding that a district court abuses its discretion in setting aside a default judgment in circumstances even remotely resembling these. The District Court reasonably weighed the equities and its order should not be disturbed.

A district court may "relieve a party or its legal representative from a final judgment" where the judgment was the result of "mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b)(1). "Where default judgments are at issue, * * * this court has taken an increasingly liberal view of Rule 60(b)," *Augusta Fiberglass Coatings, Inc.* v. *Fodor Contracting Corp.*, 843 F.2d 808, 811 (4th Cir. 1988), and it has "repeatedly expressed a strong preference that, as a general matter, defaults be avoided and that claims and defenses be disposed of on their merits." *Colleton Preparatory Academy, Inc.* v. *Hoover Universal, Inc.*, 616 F.3d 413, 417 (4th Cir. 2010). A party must simply demonstrate that it "had an

acceptable excuse for lapsing into default and that [it] has a meritorious defense to the action." *Central Operating Co.* v. *Util. Workers of Am., AFL-CIO*, 491 F.2d 245, 252 (4th Cir. 1974).[3]

Below, York argued that Hartford's neglect was inexcusable because Hartford should not have misfiled her amended complaint.  ECF No. 15 at 12; *see also* J.A. 540 (discussing York's arguments regarding the excusability of Hartford's neglect).  In this Court, however, York has thrown that argument overboard.  York now argues for the first time that Hartford's neglect was inexcusable because its adjuster should have realized the importance of York's one-page default-hearing notice buried in her petition to approve her settlement with the Millers.  York Br. 18.

That this argument is raised for the first time on appeal is reason enough to reject it; "[b]ecause the district court was not presented with [York's] argument, it obviously did not abuse its discretion in failing to consider it."  *Zornes* v. *Specialty Indus., Inc.*, 166 F.3d 1212, 1998 WL 886997, at *7 n.10 (4th Cir. 1988) (unpublished); *accord Int'l Bhd. of Elec. Workers* v. *Hope Elec. Corp.*, 293 F.3d 409, 416 (8th Cir. 2002) (because "[t]his Court does not hear arguments raised for

---

[3] The moving party must also demonstrate that it moved to set aside the default in a timely fashion and that the non-movant will not suffer unfair prejudice. *Augusta Fiberglass*, 843 F.2d at 811.  The District Court concluded Hartford satisfied these criteria, J.A. 539, and York does not challenge the District Court's findings in her opening brief.

the first time on appeal" an argument not raised below gives "no basis on which to conclude that the district court abused its discretion"). And because York did not take issue with Hartford misfiling her amended complaint in her opening brief, it would be too late to raise it in reply. *See United States* v. *Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004) ("It is a well settled rule that contentions not raised in the argument section of the opening brief are abandoned."). York has no properly preserved argument challenging the District Court's excusable-neglect holding.

In any event, York's belated argument misconstrues Hartford's contentions below and the District Court's findings. Hartford's argument that its adjuster did not understand the importance of the one-page notice regarding the West Virginia default hearing was not Hartford's "only explanation" for its default (Br. 18), or even its primary one. Instead, Hartford explained that any oversight was understandable because the notice of hearing was " 'stuck within [York's] 16-page settlement hearing notice packet.' " J.A. 537 (quoting Hartford's brief).

The adjuster's oversight was all the more excusable because the adjuster was *expecting* York to send a settlement petition as part of the process for Hartford to tender its policy limits. *See* J.A. 222. Having received the petition, the adjuster did not have any reason to comb through the packet and see if there was some other, unrelated document inserted in the middle. Nor did the adjuster have any reason to examine the papers' captions to see if Hartford had become a defendant

in a suit where—as far as the adjuster knew—it had not been served. *See* J.A. 223. And it is not as if York's papers were self-explanatory; her own attorney admitted that he made a mistake in assembling them. J.A. 861-863.

Additionally, as the District Court correctly recognized, Hartford's mistake was "mitigated by the fact that [York's] counsel neglected to mention the lawsuit to Hartford's claim adjuster." J.A. 540. York protests this finding, complaining that her attorney had "no legal obligation * * * to call and inform Hartford that it was in default." York Br. 18. But York's argument is emblematic of her larger misunderstanding. Neither Hartford nor the District Court ever claimed that Hartford was blameless or that Hartford's default was solely York's attorney's fault. *See* J.A. 540. Rather, the District Court balanced the equities and reasonably concluded that Hartford's culpability was lessened by York's counsel not bringing Hartford's default to Hartford's adjuster's attention despite being in regular contact with her and despite Hartford's communications suggesting it was unaware of its default. *Id.* York's attorney's actions simply informed the reasonableness of Hartford's neglect.

The Fifth Circuit confronted analogous circumstances in *Lacy* v. *Sitel Corp.*, 227 F.3d 290 (5th Cir. 2000). There, the defendant was served with a request for waiver of service—which the defendant declined—and separately by the clerk by certified mail. *Id.* at 292. The defendant mistakenly assumed that the certified

mailing was redundant and did not realize that it constituted proper service. *Id.* The defendant failed to appear and default was entered against it. *Id.*

The Fifth Circuit held that the defendant's neglect was excusable. It explained that the defendant's conduct " 'was not a case of a defendant choosing to play games' with the district court by failing to act on the litigation." *Id.* (citation and alteration omitted). Quite the contrary: defendant's counsel had "made repeated contacts with [plaintiff] in an attempt to resolve the suit." *Id.* Moreover, despite defendant's attempts to resolve the case and despite its notice to the plaintiff that it would not waive service, "at no time did [plaintiff] ever disabuse [defendant] of its mistaken belief that service had not been effected." *Id.* at 293. Defendant's failure to answer was therefore excusable neglect. *Id.*

The same is true here. Hartford's adjuster repeatedly attempted to tender the Hartford policy's limits to York, but York never responded. *Supra* at 7-8, 10, 12. Moreover, York's attorney never disabused Hartford's adjuster of her mistaken belief that Hartford was not a party to the West Virginia litigation. J.A. 279. Under these circumstances, Hartford's neglect in not answering the amended complaint was excusable. *Lacy*, 227 F.3d at 293.

The District Court also did not abuse its discretion in determining that Hartford had a meritorious defense. "[A]ll that is necessary to establish the existence of a 'meritorious defense' is a presentation or proffer of evidence which,

if believed, would permit either the Court or the jury to find for the defaulting party." *United States* v. *Moradi*, 673 F.2d 725, 727 (4th Cir. 1982). In this inquiry, " '[t]he underlying concern * * * is whether there is some possibility that the outcome * * * after a full trial will be contrary to the result achieved by default.' " *Augusta Fiberglass*, 843 F.2d at 812 (citation omitted).

Hartford cleared the "some possibility" bar with room to spare: The District Court found for it—correctly—on summary judgment. J.A. 1259-1261; *see also infra* at 41-53. But even focusing on the defense on which the District Court relied to vacate Hartford's default, J.A. 538-539, it was still meritorious. As the District Court explained, West Virginia law requires that "judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment." W. Va. Civ. P. 54(c). York's amended complaint demanded the $100,000 policy limits from Hartford, J.A. 37, but the West Virginia trial court inexplicably entered a judgment exceeding that sum by almost $4 million. The state court having so egregiously violated Rule 54(c), the District Court did not

abuse its discretion in finding that Hartford had a meritorious defense that warranted setting aside the default judgment.[4]

York's argument in this Court largely talks past the District Court's holding. She asserts that the District Court's meritorious-defense finding was error because "Hartford may be held liable for damages sustained in excess of its insurance policy limits." York Br. 19. But the District Court's holding was not based on the substance of West Virginia insurance law—which does not even apply to York's claims, anyway, *infra* at 35–41—but on West Virginia's procedural requirement that default judgments not be larger in amount or scope than that demanded in the complaint.

To be clear, however: Nothing in West Virginia law allows a plaintiff to turn a $100,000 first-party insurance-contract claim into a $4 million-plus tort damages award. In underinsured-motorist cases, West Virginia allows for a successful insured to recover "the amount recovered up to the policy limits, the policyholder's reasonable attorney fees, and damages proven for aggravation and inconvenience." *Marshall* v. *Saseen*, 450 S.E.2d 791, 793 (W. Va. 1994). The West Virginia trial court's judgment, which awarded York damages for the

---

[4] Indeed, this Court has said that a state court's violation of its Rule 54(c) analogue renders a default judgment void, *see In re Genesys Data Tech.*, 245 F.3d 312, 314 (4th Cir. 2001)—an independent ground to vacate a judgment under Rule 60(b). *See* Fed. R. Civ. P. 60(b)(4). But whatever the subsection, the District Court's vacatur of Hartford's default was not error.

"reasonably expected loss of income of Adam R. York," "sorrow, mental anguish, and solace," and other wrongful-death categories of damages, J.A. 68, did not fit within those narrowly defined categories. The judgment was therefore erroneous, and the District Court did not abuse its discretion in setting it aside.

## III. KENTUCKY LAW APPLIES TO YORK'S BAD-FAITH CLAIMS ARISING FROM A KENTUCKY INSURANCE POLICY ISSUED TO KENTUCKY RESIDENTS.

On the merits, York first argues that the District Court erroneously held that Kentucky law applies to her claims of bad-faith handling of her underinsured-motorist claims, which allegedly caused her—a Kentucky resident—damages. York Br. 20-28. But in her eight pages of argument, York never once cites *Kenney* v. *Independent Order of Foresters*, which this Court decided earlier this year and which squarely controls the choice-of-law analysis. Under *Kenney*, Kentucky law applies to York's claims. The District Court correctly held as much.[5]

West Virginia law recognizes both statutory claims for unfair insurance-settlement practices under the West Virginia Unfair Trade Practices Act and common-law claims for bad-faith claims handling. *See Noland* v. *Va. Ins. Reciprocal*, 686 S.E.2d 23, 33 (W. Va. 2009). Both are classified as torts under

---

[5] The District Court did not have the benefit of *Kenney* at the time it entered judgment. Nonetheless, the District Court's analysis is generally consistent with *Kenney*, and "[t]he judgment of a district court should be affirmed, if correct, although an appellate court may decide for different reasons." *Richmond Med. Ctr. for Women* v. *Gilmore*, 224 F.3d 337, 338 (4th Cir. 2000).

West Virginia law. *Id.* at 34 (common-law claims); *Kenney*, 744 F.3d at 907 (Unfair Trade Practices claims).

In tort cases, West Virginia "traditionally applies the *lex loci delicti* approach" to choice-of-law issues. *Kenney*, 744 F.3d at 907. That is, it applies "the 'law of the place of the wrong,' " which in insurance disputes is the place of the claimed non-payment, not the place of the underlying loss. *Id.* at 908. At times, however, the state has "shown a willingness to apply the *Restatement* [*(Second) of Conflict of Laws*] approach to 'resolve particularly thorny conflicts problems.' " *Id.* at 907 (quoting *Oakes* v. *Oxygen Therapy Servs.*, 363 S.E.2d 130, 131-132 (W. Va. 1987)). Under this alternative analysis, the court applies the " 'local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties.' " *Id.* at 908 (quoting *Restatement (Second) of Conflict of Laws* § 145(1)).

In *Kenney*, this Court declined to decide whether West Virginia would use the *lex loci delicti* or *Restatement* approach to determine the applicable law in bad-faith cases. *Id.* at 907-908. The Court instead concluded that no matter which analysis applied in that case, the result would be identical. *Id.* The same is true here: Whether this Court uses a *lex loci delicti* or *Restatement* approach, Kentucky law applies. The "law of the place of the wrong" in this case is Kentucky, because York suffered the injury of Hartford's alleged bad-faith claims handling in

Kentucky, where she resides. *Id.* at 908. And Kentucky has the "most significant relationship to the occurrence and the parties" because York and Adam York's estate are Kentucky residents, and York's dispute with Hartford arises from a Kentucky insurance policy. *See id.* at 908-909. York's arguments to the contrary (Br. 22-28) are refuted by *Kenney*.

For instance, York asserts that "the injury underlying this dispute unquestionably occurred in West Virginia, the place where Adam R. York died." York Br. 22. That is the wrong place of the wrong. *Kenney* held that " 'the worry, annoyance, and economic hardship of the delay in receiving compensation' (i.e., the injury) in an unfair-settlement claim is suffered in the state *where the plaintiff resides*." 744 F.3d at 908 (emphasis added; citation omitted). York is a Kentucky resident, Adam York was a Kentucky resident at the time of his death, and York administers her son's estate under the supervision of a Kentucky court. J.A. 799-800, 275-276, 350. York's injury therefore "undoubtedly" occurred in Kentucky, not West Virginia. *Kenney*, 744 F.3d at 908.

Under the *Restatement*, too, the majority of factors point to Kentucky law. In determining the state with the most significant relationship to a claim, courts consider: " '(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicil, residence, nationality, place of incorporation, and place of business of the parties; and (d) the place where the

relationship, if any, between the parties is centered.' " *Kenney*, 744 F.3d at 908 (quoting *Restatement (Second) of Conflict of Laws* § 145(2)).  Taking each in turn: Robin York's alleged injury occurred in Kentucky.  *Id.*  The Hartford adjuster's allegedly wrongful conduct of delaying payment of the Hartford policy's underinsured-motorist benefit took place in Indiana.  *See id.* (the second *Restatement* factor is judged by the location from which the insurance company denied the plaintiff benefits); J.A. 905 (Hartford's adjuster is based in Indiana). The case is between a Kentucky resident and an Indiana corporation with its principal place of business in Connecticut.  J.A. 20.  And the relationship between Hartford and York is centered in Kentucky, "where [York] sought to collect, and was denied, policy benefits."  *Kenney*, 744 F.3d at 909.

        In sum, under the analysis called for by *Kenney*, most of the relevant contacts point to Kentucky and none points to West Virginia.  And though a few contacts point to places other than Kentucky and West Virginia, that is "an outcome that [one] would expect in a diversity suit."  *Kenney*, 744 F.3d at 909. None of the non-Kentucky contacts detracts from the overall conclusion that Kentucky has the closest relationship with the parties in this case.  Indeed, York does not even *claim* that Indiana or Connecticut law should apply.

        The preponderance of contacts favoring Kentucky is further supported by the public-policy factors from the *Restatement*'s Section 6.  *Id.* (noting that the

38

preponderance of contacts "must be analyzed against" the Section 6 factors).

Those factors include " 'the relevant policies of the forum'; 'the relevant policies

of other interested states and the relative interests of those states in the

determination of the particular issue'; 'the protection of justified expectations'; and

'the basic policies underlying the particular field of law.' " *Id.* (quoting

*Restatement (Second) of Conflict of Laws* § 6)).

Here, West Virginia has little interest in having its law apply. *Kenney*

explained that West Virginia's bad-faith doctrines are " 'protectionist.  In other

words, West Virginia's law is designed as it is in order to protect the citizens of

West Virginia.' " *Id.* at 910 (citation and emphasis omitted).  And because York is

not a West Virginia citizen, West Virginia's bad-faith law is not meant to protect

her.  Under West Virginia's choice-of-law principles, "[t]he more marginal the

contact West Virginia has with the parties and the insurance contract, the less

reason there is to consider the public policy behind our uninsured/underinsured

motorist law as a factor bearing on the choice of law determination."  *Howe* v.

*Howe*, 625 S.E.2d 716, 728 (W. Va. 2005).

By contrast, Kentucky has a significant interest in having its own law apply.

The Hartford policy is a Kentucky insurance policy issued to Kentucky residents.

J.A. 103, 111.  That is important because the West Virginia Supreme Court of

Appeals has held that insurers and insureds do not have "any reasonable

39

expectation at the time the [insurance] contract[ ] [is] entered into that any litigation over the policy would be based upon West Virginia law" merely because a loss might occur there. *Liberty Mut. Ins. Co.* v. *Triangle Indus., Inc.*, 390 S.E.2d 562, 567 (W. Va. 1990). Under Section 6, too, Kentucky law should apply.

York's arguments to the contrary are meritless or undermine her own position. For instance, York places great weight on the fact that Adam York died in a West Virginia car accident. York Br. 24, 27. Yet "in the area of insurance law," the law of the state with the most significant relationship " 'should control * * * rather than that of another state whose only connection to the dispute is the fortuity that the accident occurred there.' " *McKinney* v. *Fairchild Int'l, Inc.*, 487 S.E.2d 913, 923 (W. Va. 1997) (citation omitted). Accidental contact with a state, such as Adam York had here, means little in the choice-of-law analysis. *See Adkins* v. *Sperry*, 437 S.E.2d 284, 288 (W. Va. 1993) (under Section 6, "[w]hether or not [the insured] drove * * * in West Virginia is not the controlling issue").

Similarly, York argues that she "had a justifiable expectation that" her "claim would be handled fairly and promptly in accordance with the law of the state in which the claim arose." York Br. 26. True enough. *Kenney* teaches, however, that the state law under which her bad-faith claim arose was Kentucky's, not West Virginia's. 744 F.3d at 908. And though York argues that the communications between her and Hartford were centered in West Virginia, that is

40

only half true. York's communications to Hartford regarding her claim were sent to Hartford's Kentucky address. *E.g.* J.A. 902. Moreover, to the extent Hartford mailed letters regarding York's claim to West Virginia, that is only because York hired a West Virginia attorney to press her Kentucky underinsured-motorist claims. York Br. 24. York cites no case—and we are aware of none—that holds a party's unilateral retention of counsel in a particular state influences a court's choice-of-law analysis.

In the end, *Kenney* makes clear that the relevant injury in a bad-faith case occurs in the state of the insured's residence—here, Kentucky. 744 F.3d at 908. A *Restatement* weighing-of-contacts analysis confirms that conclusion, and the *Restatement*'s public-policy factors strengthen it even further. The District Court was correct to hold that Kentucky law applies to York's claims.

## IV. YORK'S EVIDENCE DID NOT CREATE AN ISSUE OF MATERIAL FACT AS TO HER BAD-FAITH CLAIMS.

Finally, the District Court correctly concluded that York's evidence did not create an issue of material fact and that Hartford was entitled to judgment as a matter of law. J.A. 1258-1261. In Kentucky, for an insured to prevail on a bad-faith claim, " '(1) the insured must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether

41

such a basis existed.' " *Wittmer* v. *Jones*, 864 S.W.2d 885, 890 (Ky. 1993)
(citation omitted).   York's bad-faith claim fails at the threshold because Hartford
was never contractually obligated to pay her underinsured-motorist claim in the
first place.  The District Court also properly found that even taking the evidence in
the light most favorable to York, she had not demonstrated that Hartford acted with
reckless disregard towards her rights under her policy.  J.A. 1258-1261.  This
Court should affirm.

### A.    Hartford Was Never Contractually Obligated To Pay York Underinsured-Motorist Benefits.

York's bad-faith claim fails at the outset because Hartford was not
contractually obligated to pay her underinsured-motorist benefits.  *See Wittmer*,
854 S.W.3d at 890 (in order for a bad-faith claim to lie, "the insurer must be
obligated to pay the claim under the terms of the policy").[6]  Under Kentucky law,
if an insured "*agrees to settle* a claim with a liability insurer and its insured, and
the settlement would not fully satisfy the claim for personal injuries or wrongful
death so as to create an underinsured motorist claim, then written notice of the
proposed settlement must be submitted by registered or certified mail" to the
underinsured-motorist carrier.  Ky. Rev. Stat. Ann. § 304.39-320(3) (emphasis

---

[6] The District Court did not reach this argument.  But this Court "may affirm the dismissal by the district court on the basis of any ground supported by the record even if it is not the basis relied upon by the district court."  *Ostrzenski* v. *Seigel*, 177 F.3d 245, 253 (4th Cir. 1999).

added).  This notice is colloquially called a *Coots* notice.  *See Ky. Farm Bureau Mut. Ins. Co.* v. *Young*, 317 S.W.3d 43, 45 (Ky. 2010).

Following receipt of a *Coots* notice, the insurer has 30 days to either assert its subrogation rights or consent to the settlement.  Ky. Rev. Stat. Ann. § 304.39-320(3)-(4).  If the insurer does neither, the insured may consent to the settlement, extinguish the insurer's subrogation rights, and still proceed with her underinsured-motorist claim.  *See id.* § 304.39-320(3).  However, if an insured's *Coots* notice fails to comply with the statute, and the insured settles with the tortfeasor, the insured waives her coverage.  *Malone* v. *Ky. Farm Bureau Mut. Ins. Co.*, 287 S.W.3d 656, 656-657 (Ky. 2009).

The *sine qua non* of a proper *Coots* notice is that it "put [the insurer] on notice that 'an injured person or * * * personal representative *agree*[*d*] to settle a claim with a liability insurer and its insured.' "  *Id.* at 659 (citation omitted; second alteration in original); *see also* Ky. Rev. Stat. Ann. § 304.39-320(3) (notice must be submitted if insured "agrees to settle" claim).  Thus, where an insured's *Coots* notice "only reveal[s] that an offer had been made" and "d[oes] not convey that an agreement had been reached," the notice is defective.  *Id.*  Put differently, a notice that informs an insurer that the insured is " 'considering whether to accept [the tortfeasor's] offer' " is not enough to satisfy an insured's statutory obligations. *Malone*, S.W.3d at 659.

43

Here, as in *Malone*, York's January letter merely informed Hartford that the Millers' insurer had made a settlement offer and that York was considering whether to accept it. J.A. 902. Indeed, York admitted that she had not decided whether to settle with the Millers as of her January letter. J.A. 673-674. But regardless of whether York had subjectively decided to settle or not, the important point is that York's *letter to Hartford* did not tell Hartford that she had agreed to settle with the Millers. *See Malone*, 287 S.W.3d at 658-659. Her *Coots* notice was therefore defective, and York's claim for underinsured-motorist benefits was extinguished when she released the Millers from liability without Hartford's consent. *Id.* at 656.

York appears to concede that her January letter was flawed. *See* York Br. 36-37 (arguing that this Court should not require "strict compliance with *Coots*"). She nonetheless claims—relying solely on *Kentucky Farm Bureau Mutual Insurance Company* v. *Young*—that Hartford waived her waiver of underinsured-motorist benefits by not immediately responding to her January letter. York Br. 35-37. York's argument is meritless. *Young*'s requirement that an insurer follow up on a *Coots* notice applies only in "limited circumstances" not present here. *Young*, 317 S.W.3d at 48-49.

In *Young*, the insured sent his insurer a *Coots* notice stating that he would receive $100,000 from his settlement with the tortfeasor. *Id.* at 45. The day before,

however, the insured had sent his insurer a different letter indicating that his settlement with the tortfeasor would be $75,000—$25,000 less. *Id.* Confused, the insurer asked for clarification, but clarification never came. *Id.* at 45-46.

The Kentucky Supreme Court held that although the insured's *Coots* notice was sufficient by itself, the insured's prior letter containing an inconsistent settlement amount rendered the notice ambiguous and therefore defective. *Id.* at 48. The insured thus waived his underinsured-motorist coverage by settling with the tortfeasor before clarifying the ambiguity. *Id.* at 48. In dicta, however, the Court suggested that "[i]n the limited circumstances where the UIM insurer has reason to doubt the accuracy of the information in the *Coots* notice, prudence places a responsibility on the UIM insurer to take reasonable measures to resolve the doubt," which may include "a request for clarification of the information needed to make its decision to advance its own funds." *Id.* at 48-49.

*Young* is distinguishable on two grounds. First, *Young*'s dicta applies only where an otherwise-sufficient *Coots* notice is called into question by information outside the notice. *See id.* Here, there was no sufficient *Coots* notice, as even York tacitly concedes. *Supra* at 44. Second, unlike in *Young*, Hartford had no reason to doubt the information in York's January letter. The letter stated on its face that York had not yet agreed to accept the Millers' insurer's offer; the letter's request for a subrogation waiver was conditioned on York "choos[ing]" to accept.

45

J.A. 902.  The problem was not that York's letter was *ambiguous*; it was that it was *insufficient*.  *Young*'s "limited circumstances" are not present.

To be sure, Hartford's adjuster said that she would have preferred to respond directly to York's January letter.  J.A. 919.  But *Young* rejected the principle—adopted by the lower court—that "the burden [is] on the UIM insurer to clear up any discrepancies in [a] *Coots* notice."  317 S.W.3d at 46.  It was York's obligation to send a sufficient *Coots* letter to Hartford, not Hartford's obligation to point out its deficiencies.  And because York waived her underinsured-motorist coverage by not properly perfecting it, her associated bad-faith claim fails as a matter of law.  *See Wittmer*, 864 S.W.2d at 890.

### B.    York's Evidence Did Not Create A Material Issue Of Fact As To Whether Hartford Acted With Reckless Disregard To Her Rights.

For York's claim that Hartford acted with the requisite intent to go forward under Kentucky law, she "needed to prove that the conduct of [Hartford] was outrageous, because of an evil motive or reckless indifference to h[er] rights." *Motorists Mut. Ins. Co.* v. *Glass*, 996 S.W.2d 437, 452 (Ky. 1997).  This evidentiary threshold "is high indeed," *United Servs. Auto. Ass'n* v. *Bult*, 183 S.W.3d 181, 186 (Ky. Ct. App. 2003), and is akin to determining " 'whether there are tortious elements justifying an award of punitive damages.' "  *Guaranty Nat'l Ins. Co.* v. *George*, 953 S.W.2d 946, 949 (Ky. 1997) (citation omitted).

"[M]ere delay in payment does not amount to outrageous conduct absent some affirmative act of harassment." *Motorists Mut.*, 996 S.W.2d at 452. That is, "there must be proof or evidence supporting a reasonable inference that the purpose of delay was to extort a more favorable settlement or to deceive the insured with respect to the applicable coverage." *Id.* at 452-453. Similarly, "[e]vidence of mere negligence or failure to pay a claim in a timely fashion will not suffice to support a claim for bad faith. Inadvertence, sloppiness, or tardiness will not suffice; instead, the element of malice or flagrant malfeasance must be shown." *Bult*, 183 S.W.3d at 186.

York agrees that these are the relevant standards. York Br. 31-32.[7] She nonetheless argues that Hartford's conduct meets them because Hartford "acted outrageously and with an intent to deceive" her and engaged in "intentional misconduct." York Br. 34. Neither the record evidence nor Kentucky law supports York's rhetoric.

For instance, York emphasizes that Hartford valued her claim at $800,000 to $1 million in January 2012 and asserts that "[l]iability to [her] at was not fairly

---

[7] York takes issue with the District Court's reference to the Kentucky standard for bad faith as a "pleading standard." York Br. 33; J.A. 1259. But as York eventually admits, the District Court's stray mention of pleadings was simply a "misnomer." York Br. 33. The District Court properly considered the record evidence in ruling on Hartford's summary-judgment motion, not just the face of York's complaint. J.A. 1260-1261.

debatable at that moment." York Br. 34. That is a non sequitur. Any tort claim has two variables: liability and value. Hartford valued York's claims as York describes, but Hartford also was permitted to investigate whether it had a viable defense, such as assumption of the risk, to negate liability. An underinsured-motorist carrier's liability is "measured by the liability of the tortfeasor," *Cincinnati Ins. Co.* v. *Samples*, 192 S.W.3d 311, 315 (Ky. 2006), and an insurer is " 'entitled to challenge a claim and litigate it if the claim is debatable on the law or the facts.' " *Bentley* v. *Bentley*, 172 S.W.3d 375, 378 (Ky. 2005) (citation omitted). That Hartford's adjuster valued York's claim in excess of her policy limits in January 2012 did not mean that Hartford's overall liability was beyond debate.

For the same reasons, York's assertion (Br. 35) that Hartford "deliberate[ly]" attempted to avoid payment by investigating its potential defenses and potential other sources of recovery misses the mark. Again, Hartford had every right to determine whether it had a viable defense to York's claims. And Hartford's initial belief that an assumption-of-the-risk defense might be available to it was not far-fetched. West Virginia recognizes assumption of the risk as a defense when a passenger chooses to ride with an impaired driver, knowing of the driver's impairment. *See Clements* v. *Stephens*, 211 S.E.2d 110, 115 (W. Va. 1975) (passenger choosing to ride with an exhausted driver); *Young* v. *Wheby*, 30 S.E.2d 6, 8 (W. Va. 1944) (passenger choosing to ride with an intoxicated driver). In light

48

of Hartford's knowledge that Adam York was drinking with Miller on the night of the crash, J.A. 621, it was not deceptive for Hartford to investigate this potential defense before offering its policy limits.

By the same token, it was not improper for Hartford to investigate whether the Millers or others had assets from which an award in excess of their policies could be recovered. The Hartford policy does not cover damages reimbursed by others, J.A. 123, and Hartford's adjuster therefore was correct to confirm that York would not be pursuing an excess judgment from the Millers or a claim against other potential tortfeasors before Hartford tendered its policy limits. J.A. 1235-1237. In addition, Hartford had a right of subrogation on York's claim, such that it could have chosen to pay its policy limits to York and then pursue York's claim against the potentially liable parties' non-insurance assets. *See Coots*, 853 S.W.2d at 902. To determine whether to exercise that right, Hartford necessarily had to investigate what other potential tortfeasors existed and what assets they might have. *See id.* Hartford's investigation was not evidence of bad faith.

Even York's attorney agrees. He conceded in his deposition that Hartford had "not just a right" but "a duty to do an investigation." J.A. 1129. York's real complaint is what she perceived as Hartford's tendency to delay. J.A. 684. But delay becomes bad faith only when an insurer " 'lowball[s] claims or delay[s] claims hoping that the insured will settle for less.' " *Farmland Mut. Ins. Co.*, 36

S.W.3d at 376 (citation omitted).  And York never argues that Hartford asserted an assumption-of-the-risk defense to reduce the amount it offered her, nor does she claim that Hartford asked her to settle for a penny less than her $100,000 limit. Hartford's investigation may have postponed its eventual payment, but—again— "mere delay in payment does not amount to outrageous conduct."  *Motorists Mut.*, 996 S.W.2d at 452.

That leaves York's claim that Hartford's failure to immediately respond to her January letter and subsequent lapse into default is somehow evidence of bad faith by Hartford.  York Br. 36, 39-40.  Again, the Kentucky case law is to the contrary:  "breakdown[s] in communications" do not constitute bad faith.  *Blue Cross & Blue Shield of Ky., Inc.* v. *Whitaker*, 687 S.W.2d 557, 559 (Ky. App. 1985); *see also Bult*, 183 S.W.2d at 186.

Indeed, *Bult's* facts closely mirror York's allegations.  In *Bult*, the insurer's adjuster did not "follow up his telephone conversations with letters" and did not "contact [the insureds] earlier."  183 S.W.3d at 189.  At the same time, however, the insureds "received all the benefits to which they were entitled under their automobile insurance policy," the adjuster "secured payment of the various coverages," and the insurer "did not deny a single claim; nor did it deny the limits of the coverage in the [insureds'] policy."  *Id.* at 189-190 (emphasis omitted).

50

The Kentucky Court of Appeals held that the adjuster's missteps were "insubstantial." *Id.* Although there was "some delay in making the payments after demand was made," there was "no evidence from which the jury could reasonably infer that the delay that [the insureds] encountered was designed to either 'extort a more favorable settlement' from them or to conceal the amount of their coverage." *Id.* at 190.

Just so here. York rails against Hartford's adjuster not responding directly to the January letter and not following up on her oral June offer of the Hartford policy's limits with a letter. *See* J.A. 919-921. But it is hard to see how the adjuster not doing so prejudiced York. After all, no benefits were owed at that time because York had not settled with the Millers. *Supra* at 43-44. Moreover, the adjuster promptly tendered Hartford's limits once a settlement was reached. *Id.* at 7-8, 10. A faster response to York's January letter would not have gotten York her underinsured-motorist benefits any quicker.

But even granting York that these actions were negligent—and they were not—she still has not adduced any evidence that they were anything *more* than negligent. York received all of the benefits to which she was entitled and received the full limits of the Hartford policy. Moreover, Hartford never denied York's claim and never concealed the coverage available to her. As in *Bult*, any perceived delay simply is not evidence of bad faith. *See Bult*, 183 S.W.3d at 189.

York's claims of bad faith based on Hartford's state-court default (Br. 39-40) are even more tenuous.   For one, Hartford's default was the result of excusable neglect, *supra* at 29-32, and that makes its default not bad faith as a matter of law. *See Bult*, 183 S.W.3d at 186 ("Evidence of mere negligence * * * will not suffice to support a claim for bad faith.")  For another, the Kentucky Supreme Court has held that where "the remedies provided by the Rules of Civil Procedure" can correct any claimed insurer litigation misconduct, the misconduct cannot be introduced as evidence of the insurer's alleged bad faith.  *Knotts* v. *Zurich Ins. Co.*, 197 S.W.3d 512, 522-523 (Ky. 2006).  Because Hartford's default and its consequences are addressed by Federal Rules of Civil Procedure 55(c) and 60(b) and their West Virginia analogues, the default is not evidence of bad-faith claims handling.  *See id.*

Lastly, York cannot escape her own responsibility for Hartford's failure to pay her claim sooner.  *See Bult*, 183 S.W.3d at 190 (insurer did not act in bad faith where "a fair measure of the delay" the insureds complained of was "attributable to their own conduct").  For every communication that York asserts Hartford ignored, there is an equal and opposite communication that York's attorney ignored. York's attorney never responded to Hartford's adjuster's June voicemail tendering the policy limits.  Nor did he respond to the adjuster's August letter reaffirming that the limits had been tendered.  J.A. 828, 637-638.  Even after Hartford

confirmed in February 2013 in its answers to interrogatories that its repeated offers of the policy's limits were still on the table, J.A. 740-741, York still did not accept until nine months later.  J.A. 894.  But wherever the blame lies, the fact remains: No reasonable jury could conclude that the breakdown in communications that occurred in this case rose to the level of a reckless disregard of York's rights under Kentucky law.

## CONCLUSION

For the foregoing reasons, the District Court's judgment should be affirmed.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary. Nothing in York's brief calls into question the District Court's comprehensive, well-reasoned opinions. Oral argument therefore would not significantly aid the decisional process.

Respectfully submitted,

/s/ Catherine E. Stetson

MICHAEL H. CARPENTER
KATHERYN M. LLOYD
CARPENTER LIPPS & LELAND LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
(614) 365-4100

CATHERINE E. STETSON
SEAN MAROTTA
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com

JOHN L. MACCORKLE
RENATHA S. GARNER
MACCORKLE LAVENDER PLLC
300 Summers Street, Suite 800
Charleston, West Virginia 25301
(304) 344-5600

July 3, 2014

*Counsel for Defendant-Appellee
Property and Casualty Insurance
Company of Hartford*

54

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,376 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in Times New Roman 14-point font.

/s/ Catherine E. Stetson
Catherine E. Stetson

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered users of the CM/ECF system.

/s/ Catherine E. Stetson
Catherine E. Stetson